

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed March 31, 2008                                          United States Bankruptcy Judge

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| IN RE: § | |
| § | |
| HAROLD WAYNE OWSLEY and § | |
| SHARON LYNN OWSLEY, § | CASE NO. 07-44629-DML-13 |
| § | |
| Debtors. § | |

## MEMORANDUM OPINION

Harold Wayne Owsley and Sharon Lynn Owsley are chapter 13 debtors. Because they are above-median-income debtors, they are required by 11 U.S.C. § 1325(b)(3) to calculate their plan expenses in accordance with the means test set forth in section 707(b)(2)(A).[1] The debtors have applied the means test calculation and arrived at a projected disposable income of $451.88 per month, which sum they propose to pay for a period of sixty months.

---

[1] Section 1325(b)(3) provides that for above-median-income debtors, "[a]mounts reasonably necessary to be expended under paragraph (2) . . . shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2) . . . ." 11 U.S.C. § 1325(b)(3).

Creditor eCAST Settlement Corporation has objected to the confirmation of the debtors' plan. It contends that the debtors' calculations understate their actual ability to pay by $1,066.21 per month. According to eCAST, this understatement of disposable income is attributable to two factors. First, it alleges that the debtors have taken standard deductions for vehicle ownership expenses in amounts that exceed their actual car payments. According to eCAST, the debtors are required to deduct the lesser of these amounts. Second, the debtors have deducted the secured debt payment on a recreational vehicle. ECAST contends that this deduction is improper because the recreational vehicle cannot meet any necessity test. ECAST also alleges that the debtors, by claiming such expense deductions, have filed their plan in bad faith, thus violating section 1325(a)(3).

In this opinion the court concludes that (1) the debtors are authorized to deduct the standard ownership expense for two cars even if it arguably exceeds the "amount actually spent" by the debtors, (2) the debtors must prove that the recreational vehicle is necessary for the support of the debtors and their dependents in order to deduct the average monthly secured payment on the vehicle, and (3) the debtors' plan is not proposed in bad faith merely because, by claiming standardized deductions that exceed actual expenses, creditors will receive less under the debtors' plan than if the debtors had not claimed such deductions. Notwithstanding the last conclusion, the debtors failed to sustain their burden of proving that, under the totality of the circumstances surrounding the filing of their petition, they proposed their plan in good faith.

**The Debtors May Claim the Standard Ownership Expense for the
Cars Even If It Arguably Exceeds the Amount Actually Spent on the Cars**

The debtors claim ownership deductions on two cars. First, the debtors deduct $471.00 per month from their income for a 2004 Toyota Camry. This amount is equal to the standard ownership deduction for one car under the Local Standards. Internal Revenue Service Collection Financial Standards, Local Standards: Transportation, www.irs.gov/businesses/small/article/0,,id=104623,00 (hereinafter "Transportation Standards" for citation purposes). However, the debtors' average monthly secured debt payment on the Camry, when calculated in accordance with section 707(b)(2)(A)(iii), is only $185.51.

Second, the debtors also claim a deduction of $332.00 per month for a 2000 Ford F-350. This is the amount allowed by the Local Standards for the ownership of a second car. *Id*. But, the debtors' average monthly secured debt payment on the F-350 (again calculated in accordance with section 707(b)(2)(A)(iii)) is only $110.85.

As eCAST points out, section 707(b)(2)(A)(ii) provides that the debtors' monthly expenses "shall be the . . . applicable monthly expense amounts specified under the National Standards and the Local Standards . . . ." 11 U.S.C. 707(b)(2)(A)(ii)(I). According to the Internal Revenue Service website that hosts the Local Standards, "The taxpayer is allowed the amount actually spent [on a car payment] or the standard, whichever is less." Transportation Standards, www.irs.gov/businesses/small/article/0,, id=104623,00.html. ECAST argues that under section 707(b)(2)(A)(ii) the "applicable monthly expense amounts" in this case are the debtors' actual ownership expenses because those expenses are less than the amounts provided by the Local Standards.

3

Since the passage of BAPCPA, courts have been called upon to determine whether the phrase "applicable monthly expense amounts" in clause (ii) of section 707(b)(2)(A) refers only to the numbers in the tables of Collection Financial Standards, or whether the tables are qualified by either the text that accompanies the standards or the provisions of the Internal Revenue Manual. The issue most often has arisen in connection with the question of whether a debtor may claim a standard ownership expense for a car that is not subject to a note or lease payment. This question arises because the IRS's Collection Financial Standards website expressly provides that the ownership deduction is allowed for "the *lease* or *purchase* of up to two automobiles . . . ." Transportation Standards, www.irs.gov/businesses/small/article/0,,id=104623,00.html (emphasis supplied). Similar language is found in the Internal Revenue Manual. Internal Revenue Manual, Financial Analysis Handbook, Pt. 5, ch. 15, § 5.15.7 ¶ 4, *available at* http://www.irs.gov/irm/part5/. In *In re Hardacre*, 338 B.R. 718, 728 (Bankr. N.D. Tex. 2006), this court relied upon this language to hold that a debtor must own or lease a vehicle in order to claim the ownership deduction.

Since this court's decision in *Hardacre*, courts have lined up on one side or the other of the issue. One line of cases has agreed with *Hardacre*, finding that the IRS's internal practices are at least instructive, if not dispositive, of the issue. *E.g.*, *In re Ceasar*, 364 B.R. 257, 261-62 (Bankr. W.D. La. 2007); *In re Slusher*, 359 B.R. 290, 308 (Bankr. D. Nev. 2007); *In re Devilliers*, 358 B.R. 849, 859 (Bankr. E.D. La. 2007); *In re Carlin*, 348 B.R. 795, 798 (Bankr. D. Or. 2006); *In re McGuire*, 342 B.R. 608, 613 (Bankr. W.D. Mo. 2006). Other courts have disagreed with *Hardacre*, usually on the basis that section 707(b)(2)(A)(ii)(I)'s reference to the "*applicable* monthly expense

4

amounts specified under" the standards can only be construed to refer to the numbers in the tables, not the debtor's actual expenses. 11 U.S.C. § 707(b)(2)(A)(ii)(I) (emphasis supplied); *e.g.*, *In re Hylton*, 374 B.R. 579, 583 (Bankr. W.D. Va. 2007); *In re Hartwick*, 352 B.R. 867, 869-70 (Bankr. D. Minn. 2006); *In re Fowler*, 349 B.R. 414, 420 (Bankr. D. Del. 2006); *In re Demonica*, 345 B.R. 895, 902 (Bankr. N.D. Ill. 2006).

This court agrees with *In re Slusher* that inasmuch as Congress itself referred to the standards in section 707(b)(2)(A)(ii)(I), "it would be quite odd if Congress intended to preclude courts from examining the context in which . . . the IRS used and employed those standards." *In re Slusher*, 359 B.R. at 309. Thus, "practical reason would suggest that courts should consider the full manner by which the IRS uses these standards." *Id*.

*Slusher* accurately observes that allowing an extra deduction for a second car (as the tables do) is just as much an administrative determination by the IRS as specifying the conditions under which the expenses are allowed at all. *Id*. at 310. Moreover, inasmuch as the tables in the Collection Financial Standards themselves are accompanied by qualifying text (such as the note or lease limitations on car ownership deductions), it is difficult to believe that Congress could have been ignorant of those qualifications when it referred debtors to the standards for calculating expense deductions. Consequently, the court believes that the IRS's own interpretation of the standards are "instructive," *Hardacre*, 338 B.R. at 726, and, thus, may be used for "guidance," *Slusher*, 359 B.R. at 309, when addressing issues such as the one before the court.

In this case, eCAST contends that such guidance is found in that portion of the Internal Revenue Manual that provides that when "a taxpayer has a car payment, the allowable ownership cost added to the allowable operating cost equals the allowable

transportation expense," but "[t]he taxpayer is allowed the amount actually spent, or the standard, whichever is less." Internal Revenue Manual, Financial Analysis Handbook, Pt. 5, ch. 15, § 5.15.7 ¶ 4, *available at* http://www.irs.gov/irm/part5/.

ECAST points to *In re Rezentes*, 368 B.R. 55 (Bankr. D. Haw. 2007), as authority for the proposition that section 707(b)(2)(A)(ii)(I) limits expenses to the lower of the standard or the amount actually spent. In *Rezentes*, the debtors and their four children lived in a home with Mr. Rezentes's parents, for which they paid the parents $300 per month. *In re Rezentes*, 368 B.R. at 56-57. However, the Rezenteses claimed a standard housing allowance of $2,000 per month. *Id.* at 57. After adopting *Slusher*'s approach to section 707(b)(2)(A)(ii)(I) and observing that the Internal Revenue Manual allowed the debtors to deduct "the local standard or the amount actually paid, whichever is less," the court denied the deduction. *Id.* at 61-62. *Rezentes*'s conclusion was logical given its construction approach and the facts of that case.

In this case, however, the phrase "the amount actually spent [on car payments]" introduces significant ambiguity. This ambiguity is reflected in eCAST's brief. There, eCAST argues that, based upon this language, the debtor should be limited to an ownership allowance of $185.51 per month on the Camry, and $110.85 per month on the Ford F-350. But, these are not the amounts "actually spent" by the debtors each month on those vehicles. The foregoing figures are the products of the average monthly secured debt payment calculation in clause (iii) of section 707(b)(2)(A). In fact, the plan provides that the Camry lien holder will receive $144.80 per month in months four through seven, then $355.16 in months eight through forty. The Ford F-350 lien holder will receive $86.64 in months four through seven, then $225.21 per month in months eight through

6

forty. In a grammatical sense, these amounts seem to correlate more precisely to "the amount actually spent" than average monthly payments under clause (iii).

Or, it could be argued that the "amount actually spent" refers to the debtors' actual car payments when they filed their petition in bankruptcy. This amount would be more relevant to debtors who "pay direct" than those who pay through their plan. No evidence was presented as to what that amount was, but in most cases that number will be more than the average monthly secured debt payment under clause (iii) because the clause (iii) calculation divides the entire obligation by sixty, and most car obligations do not have sixty months remaining when the debtor files.

Alternatively, at the commencement of the case, "the amount actually spent" by the debtors could be an adequate protection payment. This amount could differ from the contractual car payment, the average monthly secured debt calculation under clause (iii), the "pay-direct" payment under a plan, and the plan distribution payment.

ECAST suggests that the logical corollary to the "amount actually spent" is the average monthly secured debt payment under clause (iii), but the court does not agree. The means test is not just for the purpose of calculating plan payments for above-median-income debtors. Its initial purpose is to test for chapter 7 eligibility. If when testing for chapter 7 eligibility courts are to look at "the amount actually spent" by the debtor on a car payment, is it not just as logical, if not more so, to look to the actual car payment instead of the average monthly secured debt payment under clause (iii)? And if that is so, where in either section 1325(b)(3) or section 707(b)(2)(A) is the authority for looking to the actual car payment for chapter 7 eligibility purposes, but to the average monthly secured debt payment for plan purposes?

7

As the foregoing discussion demonstrates, the phrase "the amount actually spent" has no precise counterpart when it comes to applying the means test. The reasons for this are at least two-fold. First, the IRS developed the Local Standards in order to assess the ability of non-bankrupt debtors to pay delinquent taxes. Transportation Standards, www.irs.gov/businesses/small/article/0,,id=104623,00.html. As such, in drafting its own procedures the IRS was not called upon to address concepts unique to bankruptcy practice such as "adequate protection" and "average monthly payments on account of secured debts." Second, notwithstanding its incorporation of the Local Standards into the means test, Congress adopted a completely new protocol in section 707(b)(2), and in doing so created an analytical framework that is different from the IRS's evaluation of a debtor's ability to repay delinquent taxes outside of bankruptcy.

ECAST argues, however, that permitting the debtors to deduct a standardized figure that exceeds their actual expenses is inconsistent with BAPCPA's overarching purpose to make "can-pay" debtors pay more. While this may be true, another overarching objective of the means test is, in the case of above-median-income debtors, to determine disposable income as a "simple and straightforward matter of arithmetic . . . ." *In re Farrar-Johnson*, 353 B.R. 224, 232 (Bankr. N.D. Ill. 2006) (citing 8 COLLIER ON BANKRUPTCY ¶ 1325.08[5][c][i], at 1325-65 (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. Rev. 2006)); *see also* Marianne B. Culhane & Michaela M. White, *Catching Can-Pay Debtors: Is the Means Test the Only Way?*, 13 AM. BANKR. INST. L. REV. 665, 679 (2005) (wherein the authors, who coined the phrase "can-pay-debtors," report that a principal drafter of the means test "purposefully designed [an algorithm] to limit judicial discretion on the issue of consumer debtor abuse."). When two such overriding goals

conflict with each other, the court will adopt the one that is most easily achieved by and consistent with a plain reading of the statute. For these reasons, the court concludes that the "applicable monthly expense amounts" under section 707(b)(2)(A)(ii)(I) are the amounts found in the Local Standards' tables, even if those amounts arguably exceed "the amount actually spent."[2]

### The Debtors Must Demonstrate That the Recreational Vehicle Is Necessary for the Support of the Debtors and Their Dependents In Order To Claim a Secured Debt Deduction Under 11 U.S.C. § 707(b)(2)(A)(iii)

ECAST next takes issue with the debtors' deduction of $559.57 per month under section 707(b)(2)(A)(iii) for a payment on a recreational vehicle. ECAST first contends that clause (iii) does not authorize the deduction of secured debt payments, but merely provides the method of calculating secured debt deductions. According to eCAST, the source of the deduction itself is clause (ii) of section 707(b)(2)(A), and the only function of clause (iii) is to provide the method for calculating the deduction authorized by clause (ii). Under eCAST's construction, in order for a secured debt to be deductible, it must first be the type of expense authorized by the Local Standards (transportation or housing and utilities) or one described as an "other necessary expense" in the Internal Revenue Manual. Because both the Collection Financial Standards and the Internal Revenue Manual require that any of the foregoing categories of expenses be necessary for the health and welfare of the debtor and his family or for the production of income, eCAST

---

[2] In *Hardacre*, this court held that the debtor was entitled to deduct the larger of the standard ownership expense under section 707(b)(2)(A)(ii)(I) or the average monthly secured debt payment under section 707(b)(2)(A)(iii). *In re Hardacre*, 338 B.R. at 727. The court so ruled in response to the debtor's argument that she was entitled to *both* deductions. In *Hardacre*, the trustee did not contest the debtor's right to claim the standard ownership expense reflected in the Local Standards. Thus, *Hardacre* did not address the precise issue presented here; that is, whether under the Local Standards themselves the debtors must take the lesser of the "amount actually spent" or the amount reflected in the tables.

9

argues that the debtors have no grounds upon which to deduct a payment for the recreational vehicle.

The court does not agree with eCAST's construction. First, if the authority for deducting secured debts is found only in clause (ii) of section 707(b)(2)(A), then so is the authority for deducting priority claims under clause (iv) of that section. After all, clause (iv) is phrased the same way as clause (iii).[3] Such a construction would mean that priority claims would be required to meet the necessity test found in the Internal Revenue Manual. This would create a new analytical overlay for the allowability of priority claims, for which the court finds no support in the language or structure of section 707(b)(2)(A).

Moreover, section 707(b)(2)(A)(i) expressly provides that current monthly income is to be reduced by the amounts determined under clauses (ii), (iii), and (iv). If eCAST were correct, this section would refer only to clause (ii), and it does not. For these reasons, the court concludes that clause (iii) is a stand-alone clause that does not require secured debts to first qualify for deduction under clause (ii). *See In re Hylton*, 374 B.R. at 585-86 (rejecting the same argument by eCAST).

ECAST next argues that even if clause (iii) is a stand-alone provision for the deduction of secured debts, those secured debts must still be "reasonably necessary." ECAST notes that section 1325(b)(3) states that, "Amounts reasonably necessary to be expended under paragraph (2) shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2) . . . ." According to eCAST, if Congress had intended that

---

[3] Clause (iii) states, "The debtor's average monthly payments on account of secured debts *shall be calculated as* . . .;" whereas clause (iv) states, "The debtor's expenses for payment of all priority claims (including priority child support and alimony claims) *shall be calculated as* . . . ." 11 U.S.C. § 707(b)(2)(A)(iii) and (iv) (emphasis supplied).

the amounts arrived at by application of the means test be deemed to be reasonably necessary, it would have said, "Amounts reasonably necessary to be expended under paragraph (2) shall be the amounts in subparagraph (A) of section 707(b)(2)."

The court is not convinced that Congress sought to draw the distinction advocated by eCAST. In the court's opinion, the meaning and effect of section 1325(b)(3) are plain. Not only does section 1325(b)(3) refer above-median-income debtors to section 707(b)(2)(A) for the calculation of their plan expenses, but it characterizes those expenses as reasonably necessary. *See In re Martin*, 373 B.R. 731, 734 (Bankr. D. Utah 2008) (quoting *In re Carlton*, 362 B.R. 402, 411 (Bankr. C.D. Ill. 2007) ("If an expense is allowed under § 707(b)(2), it meets the new definition of 'reasonably necessary' and no subjective review of the expense by the Court is permitted.")).

When it comes to secured debts, section 1325(b)(3) points the debtor to section 707(b)(2)(A)(iii), which provides that the debtor's average monthly payments on account of secured debts shall be calculated as set forth in subclauses (I) and (II) of that section. The structure and the grammar of clause (iii) are curious and somewhat puzzling. Subclause (I) requires the debtor to calculate "the total of all amounts scheduled as contractually due to secured creditors in each of the 60 months following the date of the petition[.]" 11 U.S.C. § 707(b)(2)(A)(iii)(I). While this language is easily understood, subclause (II) is somewhat arcane. It requires the debtor to calculate "any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts[.]" 11 U.S.C. § 707(b)(2)(A)(iii)(II). While

11

certainly not as clear as subclause (I), it is generally understood that subclause (II) refers to amounts in default prior to the debtors' petition in bankruptcy. *See* Eugene R. Wedoff, *Means Testing in the New § 707(B)*, 79 AM. BANKR. L.J. 231, 274-275 (2005). The totals of subclauses (I) and (II) are added together and divided by sixty in order to compute the monthly deduction on any secured debt. 11 U.S.C. § 707(b)(2)(A)(iii)(II).

Although the overall methodology of clause (iii) is understandable, the differences in subclauses (I) and (II) are noteworthy. First, subclause (I) places no limitation on the nature of the secured obligation that may be deducted. For example, it does not restrict deductible secured debt obligations to cars or homes. Second, subclause (I) has no express requirement that the collateral securing the debt be necessary. However, such limitations are found in subclause (II). Under subclause (II), in order for a debt, or at least the subclause (II) portion of a debt, to be included in the secured debt calculation, the court must determine that the collateral is the "*debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents.*" *Id*. (emphasis supplied) (referred to herein as the limiting language).

The grammar and punctuation of clause (iii) raise the logical question of whether the limiting language in subclause (II) applies to subclause (I) as well. The resolution of that question is critical here because the debtors were not in default on the recreational vehicle when they filed their petition in bankruptcy. Consequently, the question before the court is whether the limiting language of subclause (II) is implicated when the debtors are not in default on a secured obligation. Or, posed another way, "Is a secured

obligation deductible without limitation if the debtor is current on the obligation when he files his petition in bankruptcy?"

Initially, the grammar and punctuation used in clause (iii) suggest that the answer to this question is "yes." Subclauses (I) and (II) are separated by a semicolon and thus are presumed to be independent clauses. *See McLeod v. Nagle*, 48 F.2d 189, 191 (9th Cir. 1931) ("A semicolon is used to show that what follows is grammatically independent, though related in thought."). It is generally understood that limitations or qualifications in one independent clause do not apply to other independent clauses. *Id.* at 191 (noting that independent clauses have coordinate value and must be read separately). This construction also is consistent with the rule of the last antecedent, a rule of construction that holds that a limiting clause is usually read as modifying only the noun or phrase that it immediately follows. *Barnhart v. Thomas*, 540 U.S. 20, 25 (2003). Thus, applying routine canons of statutory construction, one could easily conclude that secured debts that are current on the day of filing may be deducted without regard to collateral type or any showing of necessity.

However, the court does not reach that result here. Each of these canons is an aid to construction, but neither is compelled. *See, e.g., United States Nat'l Bank of Or. v. Indep. Ins. Agents of Am.*, 508 U.S. 439, 454 (1993) ("[A] purported plain meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning."); *Nobelman v. American Sav. Bank*, 508 U.S. 324, 330 (1993) (holding that while the rule of the last antecedent may be sensible, "it is not compelled" and may give way to a more reasonable interpretation). Even if clause (iii) could be said to be plain and to lack ambiguity, applying the limiting language of clause

13

(II) only to defaulted obligations would produce an absurd result that is antithetical to congressional intent. *See United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242 (1989) (holding that the plain meaning of a statute should be conclusive except when "the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters.").

The court can find no compelling ground on which to exempt secured obligations from the limiting language of subclause (II) simply because they are current as of the date of filing. True, it could be argued that allowing the debtor to cure obligations that are subject to pre-petition default reduces the dividend payable to unsecured creditors and thus justifies imposing limitations on deductibility that should not apply to current obligations. However, if the purpose of the limiting language in subclause (II) is to increase the dividend to unsecured creditors, then it is both artificial and arbitrary to apply it only to obligations that are in pre-petition default. Moreover, holding that the limiting language of subclause (II) does not apply to secured debts that are current as of the date of filing would only encourage debtors to preferentially pay creditors who hold liens on luxury items so that those items could be insulated from post-petition scrutiny. Consequently, although clause (iii) is not well crafted, the court concludes that the limiting language in subclause (II) also applies to subclause (I).

Notwithstanding this conclusion, the court is again confronted with a construction issue. Does the limiting language "necessary for the support of the debtor and the debtor's dependents" modify only the words "other property" or does it also modify "motor vehicle"? 11 U.S.C. 707(b)(2)(A)(iii)(II). Again, the rule of the last antecedent would suggest that the limiting language only modifies "other property." However, as

heretofore noted, this rule is not absolute and can be overcome by other indicia of meaning. *Barnhart*, 540 U.S. at 25.

Here, other indicia of meaning are found in clause (ii) of section 707(b)(2)(A), where, by referring to the Local Standards, Congress authorized debtors to take standardized ownership deductions on up to two cars. This reference manifests Congress's determination that it is reasonable for debtors to deduct the ownership costs of up to two cars, at least up to the amounts of the standardized expenses. As this court has noted, however, clause (iii) provides a stand-alone deduction for secured debts. If the limiting language of subclause (II) modifies only "other property," then clause (iii) imposes no limits on the number or amount of car payments that may be deducted.

In *Hardacre*, this court construed section 707(b)(2)(A) to permit the debtor to deduct the larger of the transportation ownership expense under clause (ii) or the average monthly debt payment under clause (iii). *In re Hardacre,* 338 B.R. at 726-27. Given Congress's adoption of a limited deduction under clause (ii), it would be strange if Congress intended to permit the same type of deduction under clause (iii), but with no limitation. In the court's opinion, the limiting language in subclause (II) must be viewed as Congress's attempt to circumscribe the deductibility of vehicle payments under clause (iii).

Consequently, although the grammar of subclause (II) might be faulted, its purpose is manifest. In order for a vehicle payment to be entitled to deduction under clause (iii), the collateral must be "necessary for the support of the debtor and the debtor's dependents." 11 U.S.C. § 707(b)(2)(A)(iii)(II). *But see In re Hylton*, 374 B.R. at 585 (holding that a boat need not be reasonably necessary for the maintenance and

15

support of the debtors in order to deduct the payment thereon under the means test, but the proposal to retain the boat may render the plan non-confirmable for being in bad faith).

In this case, the debtors purport to deduct $559.57 per month for the recreational vehicle. At the confirmation hearing, the debtors made no effort to establish the necessity of this vehicle. Because the debtors bear the burden of proving the necessity of the vehicle, eCAST's objection to confirmation on this basis is sustained. *See In re Devilliers,* 358 B.R. at 867.

### Although the Debtors' Plan Is Not Proposed In Bad Faith Simply Because They Claim Deductions Authorized By the Means Test, The Debtors Failed to Sustain Their Burden Of Proving That the Plan Was Proposed in Good Faith

ECAST next argues that the debtors' plan cannot be confirmed because it was proposed in bad faith, and thus fails to comply with section 1325(a)(3). ECAST contends that it is not consistent with good faith for the debtors to (1) take advantage of standardized deductions that exceed actual monthly payments on the cars, and (2) pay $559.57 per month on a recreational vehicle, the necessity of which cannot be established under any circumstances, while creditors receive a dividend of 18% under the debtors' plan. Because the court has disallowed the deduction of the recreational vehicle payment, it will address this argument in the context of the debtors' claiming the standard transportation ownership allowance on their two cars. As the court understands it, the debtors argue that because their vehicle ownership deductions comply with section 707(b)(2)(A)(ii)(I), their plan is proposed in good faith.

First, the court states the obvious. The debtors' chapter 13 plan must be filed in good faith because section 1325(a)(3)[4] explicitly requires it. Second, compliance with section 1325(b)(3) and section 707(b)(2)(A) is not dispositive of good faith because good faith embraces more than just lawful compliance with those sections. In this circuit, chapter 13 plans are to be judged in the context of the totality of the circumstances surrounding the debtor's filing. *In re Chaffin*, 836 F.2d 215, 217 (5th Cir. 1988) (affirming *Public Fin. Corp. v. Freeman*, 712 F.2d 219, 221 (5th Cir. 1983)). If Congress had intended for mathematical compliance with section 1325(b) to be dispositive of good faith under section 1325(a)(3), it would have told us so. Consequently, for above-median-income debtors, compliance with the good faith requirement does not begin and end with mathematical adherence to section 1325(b).

Nevertheless, eCAST frames the issue somewhat differently. ECAST argues that it is bad faith for the debtors to take advantage of standardized deductions that exceed actual expenses when creditors are not being paid in full. ECAST's argument is founded upon the assumption that allowing debtors to deduct transportation expenses that exceed the "amount actually spent" is at odds with Congress's intent to make "can-pay" debtors pay more. However, because this court reads section 707(b)(2)(A)(ii)(I) to authorize debtors to take the standard deductions even if they exceed the "amount actually paid," it can only conclude that Congress intended that result.

Moreover, by incorporating section 707(b)(2)(A)(ii)(I)'s expense deductions into section 1325(b)(3), Congress characterized the amounts of those expenses as "reasonably necessary." 11 U.S.C. § 1325(b)(3). It seems fundamentally inconsistent to characterize

---

[4] Section 1325(a) provides in pertinent part that "the court shall confirm a plan if . . . the plan has been proposed in good faith and not by any means forbidden by law . . . ." 11 U.S.C. § 1325(a)(3).

an expense amount as reasonably necessary in section 1325(b)(3), yet conclude under section 1325(a)(3) that it is bad faith for the debtor to claim it. In attempting to reconcile the potential conflicts between these two provisions, the court concludes that expenses deemed to be "reasonably necessary" under subsection (b)(3) are presumed to be asserted in good faith under subsection (a)(3). The presumption of good faith can be negated by aggravating circumstances, an example of which might be a debtor's deduction of an ownership expense for a luxury vehicle purchased on the eve of bankruptcy.

ECAST presented no evidence of aggravating circumstances in this case, and the court's review of the debtors' schedules revealed none. The Camry is a 2004 model with 23,000 miles, and the Ford F-350 is a 2000 model with 138,000 miles. The only aggravating circumstance asserted by eCAST is the fact that creditors will receive less under the plan if the court allows the standard expenses. But, inasmuch as Congress is the author of this result, the court is loathe to call it an aggravating circumstance.

There is a second reason why, absent aggravating circumstances, claiming deductions allowed by the means test should not constitute bad faith. One of the purposes of the means test was to remove from bankruptcy courts much of the discretion they had when it came to confirmation of plans under pre-BAPCPA practice. 151 CONG. REC. S1820, 1823 (March 1, 2005) ("The means test in this bill wipes out the judge's discretion."). If section 1325(a)(3) were a trump card that permitted courts to override the means test, then the discretion taken from bankruptcy courts in section 707(b)(2) would be reinstated in section 1325(a)(3). But, it would be reinstated with the caveat that it could only be exercised when the means test treated *creditors* unfairly. After all, there is no counterpart to the good faith requirement that permits debtors to skirt the provisions

18

of the means test when it treats them unfairly (and the court routinely hears arguments that it does). Thus, not only would such a construction return to bankruptcy courts some of the discretion that Congress sought to take from them, but it would do so unevenly and unfairly.

While the debtors' claiming deductions authorized by the means test does not constitute bad faith, there are other factors that bear upon the good faith question. These include the timing of the bankruptcy petition, the debtors' motives in filing the petition, how the debtors' actions affected creditors, the debtors' treatment of creditors before and after the petition, and whether the debtors have been forthcoming with creditors and the court. *See, e.g., In re Russell*, 348 B.R. 441, 448 (Bankr. S.D. Tex. 2006); *In re Stathatos*, 163 B.R. 83, 87-88 (N.D. Tex. 1993). At the confirmation hearing, except for referring the court to the plan and the debtors' form B22C, neither party presented any evidence on the issue of good faith. While the court concludes that the debtors did not file their plan in bad faith merely by taking the standard vehicle ownership allowances under the Local Standards, that by itself does not prove that the plan was filed in good faith.

When a creditor challenges a plan as being in bad faith, it is the debtor's burden to establish good faith. *Hardin v. Caldwell*, 895 F.2d 1123, 1126 (6th Cir. 1990); *In re Aprea*, 368 B.R. 558, 567 (Bankr. E.D. Tex. 2007). It is difficult, if not impossible, for a debtor to meet this burden without putting on evidence. Usually, that evidence comes in the form of the debtor's testimony. No such evidence was given here. Consequently, the

debtors did not satisfy their burden on the good faith issue. For this additional reason, confirmation is denied without prejudice.

# # # END OF MEMORANDUM OPINION # # #